**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:<br><br>**DKC ENTERPRISES, LLC,**<br><br>Debtor. | **Case No. 25-00500 (ELG)**<br>**Chapter 11, Subchapter V** |

# FIRST AMENDED PLAN OF REORGANIZATION
# OF DKC ENTERPRISES, LLC

Lawrence A. Katz (D.C. Bar No. 252825)
Hirschler Fleischer, PC
1676 International Drive
Suite 1350
Tysons, VA  22102
Telephone: (703) 584-8362
Email: LKatz@hirschlerlaw.com

*Counsel to the Debtor*

# TABLE OF CONTENTS

**ARTICLE I. DEFINITIONS** ..................................................................................**2**

**ARTICLE II. THE DEBTOR'S BUSINESS OPERATIONS**..........................**8**

**ARTICLE III. FINANCIAL PROJECTIONS**...................................................**9**

**ARTICLE IV. LIQUIDATION ANALYSIS** ....................................................**10**
    A.    ASSETS ...................................................................................... 10
    B.    CHAPTER 7 RECOVERIES..........................................................11
    C.    COMPARISON OF RECOVERIES ...............................................11

**ARTICLE V. ADMINISTRATIVE EXPENSES AND OTHER
UNCLASSIFIED CLAIMS**..............................................................................**12**
    A.    ADMINISTRATIVE EXPENSES ................................................ 12
    B.    PROFESSIONAL FEES ............................................................... 13
        1.    Fee Applications of Debtor Professionals.......................... 13
        2.    Fee Applications of the Subchapter V Trustee.................... 13
    C.    PRIORITY TAX CLAIMS ........................................................... 13

**ARTICLE VI. CLASSIFIED CLAIMS AND INTERESTS**..........................**14**
    A.    CLASSIFICATION OF CLAIMS AND INTERESTS................... 14
        1.    General Terms .................................................................. 14
        2.    Standards for Acceptance of a Plan ................................... 14
        3.    The Classes Under the Plan and Their Voting Rights ............. 14
    B.    TREATMENT OF CLAIMS AND INTEREST CLASS ................. 15
        1.    Class 1 – First Internet Secured Claim: ........................... 15
        2.    Priority Non-Tax Claims:.................................................. 15
        3.    Class 3 – General Unsecured Claims:............................... 15
        4.    Class 4 – Equity Interests:................................................ 16
    C.    RESERVATIONS OF RIGHTS REGARDING UNIMPAIRED CLAIMS .......... 16

**ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN**............**16**
    A.    SOURCES OF CONSIDERATION FOR DISTRIBUTIONS ........... 16
        1.    Cash................................................................................. 16
        2.    Disposable Income .......................................................... 16
    B.    AMENDMENT OF FIRST INTERNET LOAN .............................. 16
        1.    Allowed First Internet Secured Claim ............................. 16
        2.    Documentation ................................................................ 17
    C.    MODIFICATION OF THE LEASE ............................................... 17
    D.    OTHER EFFECTS OF THE PLAN ............................................. 18
        1.    Organizational Existence ................................................. 18
        2.    Vesting of Assets in the Reorganized Debtor.................... 18
        3.    Authorization to Implement the Plan................................ 18
        4.    Cancellation of Financing Documents.............................. 19
        5.    Preservation of Causes of Action..................................... 19

**ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND/OR
UNEXPIRED LEASES** .................................................................................**20**
    A.    ASSUMPTION BY DEFAULT .................................................... 20
    B.    ASSUMED CONTRACTS........................................................... 20
    C.    REJECTED CONTRACTS ........................................................... 21

D.      PARTICULAR CONTRACTS ................................................................ 21
          1.      Insurance Policies ......................................................................... 21
          2.      Compensation and Benefit Plans .................................................. 21
          3.      Post-petition Contracts ................................................................. 21
**ARTICLE IX. CLAIM RESOLUTION** ...........................................................**22**
A.      RESOLUTION OF CLAIMS, GENERALLY .................................... 22
**ARTICLE X. DISTRIBUTIONS**.........................................................................**22**
A.      MANNER OF DISTRIBUTIONS..................................................... 22
          1.      Discharge of Subchapter V Trustee.............................................. 22
          2.      Means of Payment......................................................................... 22
          3.      Undeliverable Payments ............................................................... 22
          4.      Disputed Claims ........................................................................... 23
          5.      Liability......................................................................................... 23
B.      CALCULATION............................................................................... 23
          1.      Setoff and Recoupment ................................................................ 23
          2.      No Post-petition Interest .............................................................. 23
          3.      Single Satisfaction ....................................................................... 24
C.      COMPLIANCE WITH TAX REQUIREMENTS ............................. 24
**ARTICLE XI. RELEASES, EXCULPATIONS, AND INJUNCTIONS** ..........**24**
A.      DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS .............. 24
B.      RELEASE OF LIENS........................................................................ 25
C.      EXCULPATION ............................................................................... 25
D.      INJUNCTIONS................................................................................. 26
E.      SUBORDINATION RIGHTS........................................................... 27
**ARTICLE XII. CONDITIONS TO EFFECTIVE DATE** ..................................**27**
**ARTICLE XIII. MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN**.........................................................................................................**28**
A.      MODIFICATION AND AMENDMENTS ........................................ 28
B.      REVOCATION OR WITHDRAWAL .............................................. 28
**ARTICLE XIV. RETENTION OF JURISDICTION**.......................................**28**
**ARTICLE XV. MISCELLANEOUS PROVISIONS**.........................................**30**
A.      EFFECT OF PLAN............................................................................ 30
          1.      Immediate Binding Effect............................................................. 30
          2.      Entire Agreement ......................................................................... 30
          3.      Successors and Assigns ................................................................ 31
B.      CONTENTS OF PLAN...................................................................... 31
          1.      Rules of Interpretation ................................................................. 31
          2.      Exhibits ........................................................................................ 31
          3.      Non-Severability .......................................................................... 31
          4.      Conflicts ....................................................................................... 32
C.      NOTICES........................................................................................... 32
**EXHIBIT A TO PLAN OF REORGANIZATION OF DKC ENTERPRISES, LLC FINANCIAL PROJECTIONS** ........................................................**34**
**EXHIBIT B TO** ......................................................................................**35**

**AMORTIZATION AND PAYMENT SCHEDULE FOR AMENDED FIRST INTERNET LOAN ........................................................................35**
**EXHIBIT C TO ........................................................................37**
**REJECTED EXECUTORY CONTRACTS........................................................37**

**INTRODUCTION**

The Debtor, DKC Enterprises, LLC does business as Henceforth, DC (the "***Debtor***" or "***Henceforth***").  It owns and operates a craft brewery, brew pub, wine bar, and speakeasy located at 1335 H Street, NE, Washington, DC.  Henceforth commenced this case on October 30, 2025 by filing a voluntary petition under subchapter V of chapter 11 of the Bankruptcy Code.

The bankruptcy filing was precipitated by several factors beyond the Debtor's control. Initially, the Debtor's financial distress resulted from prolonged pre-construction and construction delays caused by defective engineering work, resulting in significant cost overruns and approximately one year of unplanned rent and carrying costs prior to opening. These factors materially reduced available working capital and shortened the Debtor's operating runway. The resulting liquidity constraints were compounded by unusually adverse late-2025 market conditions in Washington, DC, including reduced economic activity near Capitol Hill and a federal government shutdown that suppressed demand during the Debtor's initial ramp-up period.  Some of these venue-related conditions have partially abated, while others have continued to hamper the Debtor's efforts to operate profitably.

The Debtor filed its original Plan of Reorganization (the "***Original Plan***") on January 27, 2026 [Docket No. 73].  This First Amended Plan of Reorganization (the "***Plan***") amends the Original Plan to reflect two developments that occurred subsequent to the filing of the Original Plan: (i) the negotiation of a Second Lease Amendment and Extension of Lease ( the "***Second Lease Amendment***") between the Debtor and its landlord, 1335 H Street LLC ("***Landlord***"); and (ii) the settlement between the Debtor and its secured lender, First Internet Bank of Indiana ("***First Internet***"), with respect to First Internet's allowed secured claim.

The Debtor is entitled to propose a plan of reorganization, which, if approved by the Bankruptcy Court, will determine the distribution of assets and proceeds of the Debtor's operations to the Debtor's creditors and other stakeholders. The Debtor has proposed this plan of reorganization.  Following the classification of Claims set forth in the Plan, each holder of a Priority Tax Claims, the First Internet Secured Claim, or a General Unsecured Claim will be entitled to vote to accept or to reject the Plan. The Debtor will then request the Bankruptcy Court to determine that the Plan satisfies all applicable requirements set forth in the Bankruptcy Code, including that (a) the Plan has been proposed in good faith, (b) with respect to each impaired class of claims, each holder of a claim in that class has accepted the plan or will receive under the plan property of a value that is at least the amount that the holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code, (c) the Plan treats Priority Tax Claims consistent with section 1129(a)(9)(C) of the Bankruptcy Code, (d) confirmation of the Plan is not likely to be followed by liquidation or further financial reorganization, (e) if the Plan is not accepted by a class, then the Plan is "fair and equitable" as described in sections 1129(b)(2)(A) and 1191(c) of the Bankruptcy Code, and (f) the Plan includes all provisions and information required by sections 1123(a)(1)–(7) and 1190(1) of the Bankruptcy Code.

As described in Article VI below, the creditors that are entitled to vote include First Internet (as sole holder of the First Internet Secured Claim) and the holders of General Unsecured Claims. First Internet will receive an amended secured loan that, among other things, reduces the outstanding principal amount to the value of First Internet's collateral, while maintaining the

existing contractual interest rate and maturity. The holders of General Unsecured Creditors will receive quarterly distributions to be paid by the Reorganized Debtor from projected disposable income.

The Debtor believes that the Plan represents the best opportunity for creditors to receive substantial recoveries on their Claims, and therefore encourages all eligible creditors to vote to accept the Plan.  All parties in interest should read the Plan (including its exhibits) carefully and should consult independent counsel regarding their rights and obligations in relation to the Plan.

## ARTICLE I.
## DEFINITIONS

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Expense*" means any cost or expense of administration of the Chapter 11 Case entitled to priority pursuant to sections 364(c)(1), 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the Debtor's business; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 330(a) or 331 of the Bankruptcy Code, including the fees of Debtor Professionals; (c) any administrative expense described in section 503(b)(9) of the Bankruptcy Code; and (d) Restructuring Expenses.

2.      "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided in this Plan, a Claim or Interest that has been or hereafter is: (a) evidenced by a proof of claim, as applicable, timely filed by the Claims Bar Date or that is not required to be evidenced by a filed proof of claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order; (b) scheduled by the Debtor as neither disputed, contingent nor unliquidated, and as for which no proof of claim has been timely filed; or (c) expressly deemed Allowed (i) pursuant to the Plan or (ii) in any stipulation that is approved or any Final Order entered by the Bankruptcy Court.  A Claim shall be considered Allowed pursuant to the foregoing clause (a) or (b) only to the extent that no objection to the allowance thereof or request for estimation has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection or request is so interposed, such Claim shall have been Allowed by a Final Order. No Claim of any entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such entity pays in full the amount that it owes the Reorganized Debtor.  A proof of claim filed after the applicable Claims Bar Date shall not be Allowed unless a Final Order Allows such late-filed Claim or Interest. An Allowed Claim: (1) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed and (2) shall be net of any setoff that may be exercised by the Debtor against the holder of such Claim. Notwithstanding anything to the contrary in the Plan, the Reorganized Debtor shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. "*Allow*," "*Allowance*" and "*Allowing*" shall have correlative meanings. A Claim Allowed by the Debtor or by the Bankruptcy Court solely for the purpose of voting to accept or reject the Plan shall not be considered an Allowed Claim unless it satisfies this definition.

3. "*Amended First Internet Loan*" has the meaning ascribed to it in Article VII.B.1.

4. "*Article*" means an article of the Plan.

5. "*Bankruptcy Code*" means title 11 of the U.S. Code, as applicable to the Chapter 11 Case and this Plan.

6. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Columbia.

7. "*Bankruptcy Rules*" means (a) the Federal Rules of Bankruptcy Procedure, as amended from time to time and as applicable to the Chapter 11 Case, promulgated pursuant to 28 U.S.C. § 2075, and (b) the general, local, and chambers rules and procedures of the Bankruptcy Court.

8. "*Business Day*" means any day other than (a) a Saturday or Sunday, (b) a "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or (c) a day on which commercial banks in the District of Columbia are required or authorized by law to remain closed.

9. "*Cause of Action*" means any action, claim, counterclaim, cross-claim, third-party claim, cause of action, controversy, demand, right, remedy, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, debt, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, recoupment, or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, and (d) any counterclaim or defense, including fraud, constructive fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

10. "*Chapter 11 Case*" means the present case under subchapter V of chapter 11 of the Bankruptcy Code, captioned as *In re DKC Enterprises, LLC, d/b/a Henceforth, DC*, and docketed by the Bankruptcy Court as case number 25-00500 (ELG).

11. "*Claim*" means a "claim," as defined in section 101(5) of the Bankruptcy Code against a Debtor.

12. "*Claim Objection Deadline*" means the date that is 180 days following the Effective Date, or such later date that is approved by order of the Bankruptcy Court for cause upon motion by the Reorganized Debtor.

13. "*Claims Bar Date*" means the applicable deadline by which to file a proof of claim.

14. "*Class*" means a class of Claims or Interests designated in Article VI of the Plan.

15.     "*Confirmation Date*" means the date on which the Confirmation Order is entered.

16.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan.

17.     "*Confirmation Order*" means the Bankruptcy Court order confirming the Plan pursuant to section 1191 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Debtor.

18.     "*Covered Entities*" has the meaning ascribed to it in Article XI.D.

19.     "*Covered Exculpation Matters*" has the meaning ascribed to it in Article XI.C.

20.     "*Covered Matters*" has the meaning ascribed to it in Article XI.D.

21.     "*Cure*" or "*Cure Claim*" means a monetary Claim (unless waived or modified by the applicable counterparty) on account of the Debtor's defaults under an Executory Contract assumed by such Debtor under section 365 or 1123 of the Bankruptcy Code, other than (a) a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code or (b) a Claim that, by consent of the applicable counterparty, is to be treated as a General Unsecured Claim.

22.     "*Debtor*" means DKC Enterprises, LLC, d/b/a Henceforth DC.

23.     "*Debtor Release*" means the releases set forth at Article XI.C. of the Plan.

24.     "*Definitive Documents*" means, collectively, the Plan (including any Plan Supplement), the Confirmation Order, all other documents, motions, pleadings, briefs, applications, orders, agreements, supplements, notices, and other filings related to any of the foregoing or as may be reasonably necessary or advisable to implement the Restructuring.

25.     "*Disallowed*" means, with respect to any Claim or Interest, (a) a Claim or Interest, or any portion thereof, that has been disallowed by a Final Order or (b) except as otherwise specified in the Plan or a Final Order, a Claim that has been scheduled by the Debtor at zero or as contingent, disputed or unliquidated or that has not been scheduled by the Debtor and, in each case, as to which no Proof of Claim has been timely filed. "*Disallow*" and "*Disallowance*" shall have correlative meanings.

26.     "*Disposable Income Payment Amount*" has the meaning ascribed to it in Article VI.B.3.b.

27.     "*Disputed*" means, with respect to a Claim or Interest, any Claim or Interest that is not yet Allowed or Disallowed.

28.     "*Effective Date*" means, with respect to the Plan, (a) the first Business Day on which all conditions precedent specified in Article XII of the Plan have been satisfied or waived in accordance with the Plan or (b) such later date as agreed to by the Debtor.

29.     "*Entity*" is as defined in section 101(15) of the Bankruptcy Code.

30.　　"*Estate*" means, with respect to a debtor in a case under the Bankruptcy Code, the estate created of such debtor assets created pursuant to section 541 of the Bankruptcy Code.

31.　　"*Exculpated Parties*" means, collectively, and in each case in their capacities as such and, in each case, to the maximum extent permitted by law: (a) the Debtor, (b) the Subchapter V Trustee, and (c) the Related Parties of the foregoing.

32.　　"*Executory Contract*" means an executory contract or an unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable that is capable of being assumed, assumed and assigned or rejected under section 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda or supplements thereto.

33.　　"*Final Order*" means, as applicable, an order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending; *provided*, that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

34.　　"*First Internet*" means First Internet Bank of Indiana, the holder of secured notes backed by the U.S. Small Business Administration.

35.　　"*First Internet Secured Amount*" has the meaning ascribed to it in Article VII.B.1.

36.　　"*General Administrative Expenses*" means any Administrative Expense other than the fees and expenses of the Debtor's Professionals and the Subchapter V Trustee.

37.　　"*General Administrative Expenses Bar Date*" means the date that is thirty (30) calendar days after the later of (a) the Effective Date and (b) the date when such Claim becomes due and payable by the Debtor in the ordinary course, unless otherwise ordered by the Bankruptcy Court or otherwise agreed by the Debtor and the relevant claimant.

38.　　"*General Administrative Expenses Objection Deadline*" means the deadline for objecting to a General Administrative Expense, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be set by the Bankruptcy Court upon a motion by the Reorganized Debtor or by agreement between the Reorganized Debtor and the relevant claimant; *provided* that, if the Reorganized Debtor files such a motion before the

expiration of the then-effective General Administrative Expenses Objection Deadline, such General Administrative Expenses Objection Deadline shall be tolled pending entry of a further order by the Bankruptcy Court.

39.     "*General Unsecured Claim*" means any Claim, other than an Administrative Expense, a Priority Tax Claim, a Priority Non-Tax Claim, or the First Internet Secured Claim.

40.     "*Governmental unit*" is as defined in section 101(27) of the Bankruptcy Code.

41.     "*Impaired*" is as defined in section 1124 of the Bankruptcy Code.

42.     "*Income Distribution Period*" has the meaning ascribed to it in Article VI.B.3.

43.     "*Insurance Policies*" means all insurance policies issued to or providing coverage at any time to the Debtor and all agreements, documents, or instruments ancillary thereto.

44.     "*Insurer*" means any company or other entity that issued or provided any Insurance Policy (including any third-party administrator), and any predecessors and/or affiliates thereof.

45.     "*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Debtor, including any share of common or preferred stock, LLC interest, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Debtor, and any option, warrant, or right, contractual or otherwise, to purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Debtor, whether or not transferable, issued or unissued, authorized, or outstanding.

46.     "*Lien*" is as defined in section 101(37) of the Bankruptcy Code.

47.     "*Person*" is as defined in section 101(41) of the Bankruptcy Code.

48.     "*Petition Date*" means October 30, 2025.

49.     "*Plan*" means this *First Amended Plan of Reorganization of DKC Enterprises, LLC*, together with all exhibits, appendices, and schedules thereto, including the Plan Supplement, as defined herein, as each of the same may be amended, modified or supplemented in accordance with its terms.

50.     "*Plan Supplement*" means the compilation of documents or forms of documents, schedules, and exhibits to the Plan to be filed subsequent to this Plan (if any), as each may be amended, supplemented, or modified from time to time in accordance with this Plan.

51.     "*Priority Non-Tax Claim*" means any Claim that is entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense or a Priority Tax Claim.

52.     "*Priority Tax Claim*" means any Claim of a governmental unit that is entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

53.     "*Privilege Rights*" means, collectively, any attorney-client privilege, attorney work product protection, or any other similar privilege or protection from disclosure belonging to or operating in favor of the Debtor or its estate.

54.     "*Pro Rata*" means, for the holder of an Allowed Claim or Interest in a particular Class, proportional to the ratio of the amount of such Allowed Claim or Interest to the amount of all Allowed Claims or Allowed Interests (as applicable) in the same Class.

55.     "*Projections*" has the meaning ascribed to it in Article III. Words such as "*Project*" and "*Projected*" bear correlative meanings.

56.     "*Proof of Claim*" means a proof of claim filed in the Chapter 11 Case.

57.     "*Reinstated*" means, with respect to a Claim, that such Claim is accorded treatment provided in section 1124(2) of the Bankruptcy Code.

58.     "*Related Parties*" means, with respect to a specified entity, (x) such specified entity's predecessors, successors, assigns, current or former shareholders, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, managers, direct and indirect equity holders, portfolio companies, and management companies, (y) with respect to such specified entity and each of the other entities in the foregoing clause (x), such entity's current and former directors, officers, principals, managers, members, partners (including limited partners), employees, trustees, independent contractors, managed accounts or funds, fund advisors, investment advisors, advisory board members, management companies, investment bankers, financial advisors, restructuring advisors, accountants, actuaries, agents, consultants, representatives, attorneys, and other consultants and professional advisors; and (z) with respect to such specified entity and each of the other entities in each of the foregoing clauses (x) and (y), each such entity's respective heirs, executors, estates, and nominees.

59.     "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) with respect to each of the entities in the foregoing clauses (a) and (b), each such entity's current and former Related Parties.

60.     "*Reorganized Debtor*" means the Debtor or any successor or assign thereto by merger, consolidation, or otherwise, on or after the Effective Date, including any entity that receives all or substantially all assets of the Debtor.

61.     "*Restructuring*" means the comprehensive restructuring of the existing debt and other obligations of the Debtor on the terms and conditions set forth in this Plan.

62.     "*SBA*" has the meaning ascribed to it in Article II.

63.     "*Schedules*" means the schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtor with the Bankruptcy Court.

64.     "*Secured*" means, with respect to a Claim, any Claim or portion thereof that is secured by a lien on property in which an estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

65.     "*Subchapter V Trustee*" means the trustee appointed in the Chapter 11 Case under section 1183 of the Bankruptcy Code.

66.     "*U.S. Trustee*" means the United States Trustee for Region 4 or the Office of the U.S. Trustee for Region 4, as applicable.

67.     "*Unimpaired*" means, with respect to a Class, Claim, Interest, or a holder of a Claim or Interest, that such Class, Claim, Interest, or holder is not impaired.

## ARTICLE II.
## THE DEBTOR'S BUSINESS OPERATIONS

The Debtor is a hospitality business located on H Street, NE in Washington, DC, operating as a craft brewery, taproom, wine bar, cocktail lounge, and events venue. The business was formed to create a community-oriented gathering space, support local suppliers, and provide stable employment to local residents. The Debtor current has 24 employees.

The Debtor was formed in early 2023 and raised initial capital during the second and third quarters of 2023 from private investors. Funds were intended to support lease obligations, design and engineering, permitting, construction, equipment procurement, and initial operating expenses. The business plan assumed a customary development and construction timeline for a hospitality project of this type in Washington, DC.

From the fourth quarter of 2023 through the second quarter of 2024, the Debtor engaged in architectural and engineering planning. During this period, the civil engineering firm subcontracted through the architect produced multiple incomplete and incorrect engineering drawings, requiring repeated revisions over approximately six months. These revisions delayed permitting and construction mobilization and materially increased pre-opening carrying costs, including rent and professional fees, resulting in significant working capital burn prior to construction.

Construction commenced in the third quarter of 2024 and concluded in April 2025. Shortly before construction began, the contractor's assigned project supervisor passed away unexpectedly, requiring the contractor to assign a replacement supervisor unfamiliar with the project. Construction was further delayed by errors in the engineering drawings and execution issues on site, resulting in multiple change orders, rework, and schedule slippage. As a result, the construction timeline extended from an anticipated five months to approximately nine months. In total, the project was delayed by approximately one year, during which time the Debtor continued to pay full contractual rent and related carrying costs.

8

The business opened in May 2025. Initial operating results in May and June were strong and met or exceeded expectations. As anticipated, revenues declined during July and August due to normal seasonal patterns in the Washington, DC hospitality market.

Beginning in August 2025, Washington, DC experienced a significant federal law enforcement surge that reduced foot traffic and discretionary spending city-wide. This impact continued into September, when the typical seasonal recovery did not occur. In October and November 2025, a federal government shutdown caused a sharp decline in economic activity. The Debtor is located near Capitol Hill and relies heavily on a customer base tied to the federal government. Uncertainty surrounding the duration of the shutdown, employee pay status, and potential layoffs further suppressed demand, particularly in the H Street, NE corridor.  This shutdown, at that time the longest in U.S. history, ended on November 12, 2025.

The combined effects of extended pre-opening delays, construction cost overruns, prolonged rent payments prior to opening, and adverse market conditions materially reduced the Debtor's operating runway during its initial ramp-up period. As a result of these liquidity constraints, the Debtor voluntarily filed for relief under Subchapter V on October, 30, 2025 to preserve operations and stabilize the business. Since filing, management has implemented significant cost controls and expense reductions while maintaining ongoing operations.

While the government shutdown that was in effect at the time of the Debtor's bankruptcy filing ended two weeks later, the relief from the termination of the shutdown was short-lived, as another partial shutdown began on January 31, 2026, lasting for four days.  This shutdown was then followed by a second, ongoing partial shutdown affecting the Department of Homeland Security (DHS).  As of early April 2026, the DHS shutdown became the longest partial government shutdown in U.S. history.

Despite these challenges, the Debtor has received meaningful industry and community recognition, including being named runner-up for Best New Bar in Washington, DC by the Washington City Paper, winning first place overall in a local beer competition, and being named one of the 26 Best New Breweries in America by VinePair.  Community response has been strongly supportive, and management and investors remain confident in the long-term viability and profitability of the business once stabilized under the restructuring plan.

### ARTICLE III.
### FINANCIAL PROJECTIONS

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor. In connection with that requirement, the Bankruptcy Code requires the Plan to include projections with respect to the Debtor's ability to make payments under the Plan. Those projections (the "***Projections***") are attached as **Exhibit A** to the Plan.

The Projections have been prepared by the Debtor's management and advisors based on the Debtor's available books and records and other available sources. The Projections are based on

9

several assumptions regarding the future performance of the Debtor's operations and the economic environment in which the Debtor operates. Although the Debtor has proposed the Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that the Debtor's assumptions will prove correct or that the Projected financial results will be realized. The Projections are not intended to be consistent with generally accepted accounting principles or any other standards, and have not been examined by an independent auditor. In deciding whether to vote to accept or reject the Plan, eligible creditors must make their own determinations as to the reasonableness of the Debtor's assumptions and the reliability of the Projections. The inclusion of the Projections within this Plan should not be regarded as a representation or warranty by the Debtor or any other person that the Projections will be realized.

A summary of certain material assumptions is set forth below:

- The Effective Date of the Plan will occur on or about June 1, 2026, so that payments that are based on the Debtor's net disposable income under the Plan will reflect performance from June 2026 through May 2029.
- Most variable costs, including brewing ingredients, food, supplies and processing fees, will remain fairly consistent with historical levels as a percentage of net sales. Most fixed costs will remain fairly consistent with historical levels as a fixed dollar amount.
- Lease costs for the premises will be consistent with the provisions of the Second Lease Amendment and Extension of Lease executed by the Debtor and Landlord, but awaiting Bankruptcy Court approval, as further discussed in Article VII.C.
- The First Internet Loan Claims will receive treatment consistent with a Stipulation and Consent Order entered by the Bankruptcy Court on April 13, 2026 as further discussed in Article VII.B.1.
- The Priority Tax Claim will be allowed in the amount of $25,092.65 unless otherwise adjusted consistent with Article IX.A.

## ARTICLE IV.
## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all creditors and equity interest holders who do not accept the Plan will receive as much under the Plan as such creditors and equity interest holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.

## A.    ASSETS

The Debtor's assets consist principally of (a) approximately $200.00 in cash or cash equivalents as of the filing of the Plan, (b) deposits of approximately $4,900.00; (c) accounts receivable of just under $9,250.00; (d) the inventory of brewing ingredients, food and beverages of approximately $14,500.00; (e) other tangible assets in the form of used furniture, fixtures and equipment; and (f) common-law intellectual property associated with the name "Henceforth DC" and its branding.

Substantially all assets of the Debtor's estate are encumbered by Liens held by First Internet.

10

**B.    CHAPTER 7 RECOVERIES**

The Debtor estimates that the recoveries of creditors in a chapter 7 liquidation would be as follows:

| Asset | Liquidation Value | Recipient |
|---|---|---|
| Cash | $200.00 | First Internet Secured Claim |
| Receivables | $3,000.00 | First Internet Secured Claim |
| Inventory | *De minimis* | First Internet Secured Claim |
| Other tangible assets | *De minimis* | First Internet Secured Claim |
| Intellectual property | *De minimis* | First Internet Secured Claim |

As set forth above, First Internet would likely receive the proceeds of the Debtor's business assets—cash, receivables, tangible assets, and intellectual property—in a chapter 7 liquidation. The Debtor's cash on hand is a known amount that would be realized in a liquidation. The receivables fluctuate depending on the timing of event deposits and payment processing, but once operations cease as a result of conversion to chapter 7, no further accounts receivable will be generated. All other business assets have minimal liquidation value. Accordingly, First Internet would receive in a chapter 7 liquidation no more than the values of cash and receivables set forth in the table above, plus any amounts recovered from tangible assets, net of the cost of removal and sale.  While the Debtor and First Internet are in agreement that the fair market value of the tangible assets, together with the cash, accounts receivable and inventory, have a combined fair market value of $74,700, the cost of disassembly, removal and transport of the tangible assets is estimated to exceed any gross liquidation value, resulting in a net liquidation value that is *de minimis*.

Any recovery from the liquidation of the Debtors assets would be further reduced by the administrative costs associated with the chapter 7 proceedings, including commissions due the chapter 7 trustee and allowed fees and expenses of the chapter 7 trustee's professionals, followed by the pre-conversion administrative costs associated with the subchapter V proceedings.

The holders of Priority Tax Claims, General Unsecured Claims and Equity Interests would receive no recovery in a chapter 7 liquidation.

**C.    COMPARISON OF RECOVERIES**

As set forth above, First Internet is likely to receive in a chapter 7 liquidation an amount far less than the stream of quarterly payments that it stands to receive on the secured portion of its claims under the Amended First Internet Loan.

Since holders of Priority Tax Claims are paid in full and General Unsecured Claims stand to receive a portion of the Debtor's positive cash flow under the Plan, recoveries for such holders are likely to be significantly higher under the Plan than in a chapter 7 liquidation.

The holders of Equity Interests will retain their LLC interests under the Plan, which have some value in respect of the business's future income stream. This value is evidently greater than the zero recovery that they would receive in a liquidation on account of their Equity Interests.

## ARTICLE V.
## ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article VI.

## A.    ADMINISTRATIVE EXPENSES

Each holder of an unsatisfied Administrative Expense shall be entitled to receive cash in an amount equal to the Allowed amount of its Administrative Expense, in full and final satisfaction of its Administrative Expense. Any Administrative Expense that arose in the ordinary course of the Debtor's business after the Petition Date may be paid in accordance with the terms and conditions of the particular transaction or commercial relationship that gave rise to the Administrative Expense (or on such other terms as may be agreed by the holder and the Reorganized Debtor), without any further action by the holder of the Administrative Expense. Any Administrative Expense that is not paid in the ordinary course of business shall be paid (a) on the Effective Date if the Administrative Expense has been Allowed as of the Effective Date or (b) otherwise, promptly after the date on which the Administrative Expense is Allowed by a Final Order or by agreement with the Reorganized Debtor.

Any application for payment of an Administrative Expense must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than the Administrative Expense Bar Date.  **Any entity that does not properly file and serve a timely application for payment of an Administrative Expense shall be forever barred from asserting that Administrative Expense against the Reorganized Debtor or its property, and the Administrative Expense shall be deemed discharged as of the Effective Date.**

The Reorganized Debtor may settle informal requests and formal applications for Administrative Expenses without further notice and without further approval of the Bankruptcy Court. The Reorganized Debtor (or another party with standing) may object to any application for payment of an Administrative Expense no later than the Administrative Expense Objection Deadline. Unless the Reorganized Debtor (or another party with standing) timely objects to a timely and proper application for payment of an Administrative Expense, that Administrative Expense will be deemed Allowed in the amount requested.

**B.    PROFESSIONAL FEES**

### 1.    Fee Applications of Debtor Professionals

Each Debtor Professional (other than one that does not seek payment of fees or expenses) shall file and serve a final fee application in a manner consistent with the Bankruptcy Code and the Bankruptcy Rules, no later than 60 days after the Effective Date. All fees and expenses of the Debtor Professionals that are Allowed by the Bankruptcy Court after notice and a hearing shall be paid by the Reorganized Debtor as provided in subsection 2 herein, and thereafter in equal quarterly payments over the Income Distribution Period, as hereinafter defined, or such longer period as may be agreed to by the Debtor Professional.

The Reorganized Debtor may, in the ordinary course of business and without any further notice to or approval of the Bankruptcy Court, pay any fees and expenses that arise from professional services that are rendered to the Reorganized Debtor after the Effective Date, including any that relate to implementation of the Plan. No professional employed or retained by the Reorganized Debtor shall be required to comply with the procedures set forth in §§ 327–331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date.

### 2.    Fee Applications of the Subchapter V Trustee

The Subchapter V Trustee shall file and serve a final fee application in a manner consistent with the Bankruptcy Code and the Bankruptcy Rules, no later than 60 days after the Effective Date. All fees and expenses of the Subchapter V Trustee that are Allowed by the Bankruptcy Court after notice and a hearing shall be paid by the Reorganized Debtor (a) first, from funds escrowed by the Debtor prior to the Effective Date of the Plan, and (b) second, with respect to any balance due after payment of the escrowed funds, in equal quarterly payments over the Income Distribution Period, as hereinafter defined.  Any escrowed funds in excess of the Allowed Amount of the Subchapter V Trustees fees shall be paid to the Debtor's Professionals up to the Allowed Amount of the Debtor's Professional fees and expenses.

**C.    PRIORITY TAX CLAIMS**

Each holder of an unsatisfied Priority Tax Claim shall be entitled to receive cash in an amount equal to the Allowed amount of its Priority Tax Claim, with interest at the statutory rate, in full and final satisfaction of its Priority Tax Claim, paid in equal quarterly installments on or before the last day of the month following the preceding three-month quarter, beginning with the first full month following the Effective Date and ending with the 60th full month following the Petition Date.  Each Priority Tax Claim for which no return or payment is yet due as of the Effective Date including any filing extensions, or for which no amount has been Allowed as of the Effective Date, shall be paid in equal quarterly installments beginning with the first full month after the date of Allowance and ending with the 60th full month following the Petition Date.

## ARTICLE VI.
## CLASSIFIED CLAIMS AND INTERESTS

### A.   CLASSIFICATION OF CLAIMS AND INTERESTS

#### 1.   General Terms

All Claims and Interests, except for those described in Article V, are classified as set forth in this Article VI.

#### 2.   Standards for Acceptance of a Plan

The Bankruptcy Code defines "acceptance" of a plan by a Class of (a) Impaired Claims as acceptance by creditors that hold at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class held by creditors that cast ballots for acceptance or rejection of the Plan and (b) Impaired Interests as acceptance by Interest holders that hold at least two-thirds (⅔) in amount of the Allowed Interests in such Class held by holders that cast ballots for acceptance or rejection of the Plan. However, any Class of Claims or Interests that is Unimpaired under the Plan is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan. Likewise, any Class of Claims or Interests that does not entitle the holders of such Claims or Interests to receive or retain any property under the Plan on account of such Claims or Interests is deemed to have rejected the Plan and is therefore not entitled to vote to accept or reject the Plan.  Any Class that does not have a Claim or an Interest, as applicable, as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for all purposes.

Pursuant to an agreement that it reached with First Internet, the Debtor believes that First Internet will vote in favor of confirmation of the Plan with respect to both the First Internet Secured Claim and First Internet's General Unsecured Claim.  Under these circumstances, the Debtor anticipates that the Plan can be confirmed consensually pursuant to section 1191(a) of the Bankruptcy Code.  If that were not to occur for some reason, the Debtor intends to seek confirmation of the Plan pursuant to section 1191(b) of the Bankruptcy Code with respect to each rejecting Class.

#### 3.   The Classes Under the Plan and Their Voting Rights

The classification of Claims and Interests is summarized as follows:

| Class | Claims or Interests | Impairment | Voting Rights |
|-------|--------------------|-----------|----------------|
| 1 | First Internet Secured Claim | Impaired | **Entitled to vote** |
| 2 | Priority Non-Tax Claims | Unimpaired | Presumed to accept |
| 3 | General Unsecured Claims | Impaired | **Entitled to vote** |
| 4 | Equity Interests | Unimpaired | Presumed to accept |

14

**B.     TREATMENT OF CLAIMS AND INTEREST CLASS**

**1.     Class 1 – First Internet Secured Claim:**

First Internet shall receive, as of the Effective Date, the Amended First Internet Loan in a principal amount equal to the First Internet Secured Amount. The foregoing treatment shall be in full and final satisfaction of the First Internet Secured Claim.

**2.     Priority Non-Tax Claims:**

Unless the holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder of an unsatisfied Allowed Priority Non-Tax Claim shall (a) receive from the Reorganized Debtor, in full and final satisfaction of its Priority Non-Tax Claim, payment in cash, equal to the Allowed amount of the Claim, on the latest of (i) the Effective Date, (ii) promptly after the Claim becomes Allowed by Final Order or agreement with the Reorganized Debtor, and (iii) the date when the Claim becomes due and payable in the ordinary course of business, or (b) be otherwise rendered Unimpaired.  The Debtor does not believe there are any holders of Allowed Priority Non-Tax Claims.

**3.     Class 3 – General Unsecured Claims:**

**a.  Distributions:**

The Debtor shall distribute *Pro Rata* to the holders of Allowed General Unsecured Claims all funds constituting the Disposable Income Payment Amounts, other than any amounts paid or reserved for payment of (i) the fees and expenses of the Subchapter V Trustee or the Debtor's Professionals under Article V.B., (ii) amounts due under the Amended First Internet Loan, and (iii) amounts due for the Allowed Priority Tax Claim.  The foregoing distributions shall be in full and final satisfaction of the General Unsecured Claims.

**b.  Disposable Income:**

Each month, on or before the last day of the month, beginning with the first full month following the Effective Date, the Reorganized Debtor shall fully fund the amount of the minimum operating reserve (the "***Operating Reserve***") set forth in the Financial Projections for the following month.  The amount of funds, if any, remaining after (i) payment of all ongoing expenses for the month, including rent due under the Lease, as amended (ii)  payment of the amount due under the Amended First Internet Loan, (iii) payment of the amount due to the holder of the Priority Tax Claim, (iv) funding of the Operating Reserve, and (v) payment of the amount due the Subchapter V Trustee or the Debtor's Professionals under Article V.B., shall constitute the "***Disposable Income Payment Amount.***" The Financial Projections and the obligation to pay the Disposable Income Payment Amount shall extend until the end of the 36th full month following the Effective Date (the "***Income Distribution Period***"). If the Disposable Income Payment Amount is negative for a given month, then no Disposable Income Payment Amount shall be paid for that month, and the negative amount for that month shall carry over to the following month.

On or before the last day of the month immediately following the end of the three-month period following the Effective Date, and on or before the last day of the month following each

15

subsequent three-month period during the Income Distribution Period, the Reorganized Debtor shall distribute the Disposable Income Payment Amount, *Pro Rata*, to holders of Class 3 General Unsecured Creditors.

### 4. Class 4 – Equity Interests:

The Equity Interests shall be Allowed and Reinstated on the Effective Date.

## C. RESERVATIONS OF RIGHTS REGARDING UNIMPAIRED CLAIMS

Nothing in the Plan shall diminish or impair the Reorganized Debtor's rights and defenses with respect to any Unimpaired Claim, including setoffs or recoupment against Reinstated Claims or Unimpaired Claims. Except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan.

## ARTICLE VII.
## MEANS FOR IMPLEMENTATION OF THE PLAN

## A. SOURCES OF CONSIDERATION FOR DISTRIBUTIONS

### 1. Cash

The Reorganized Debtor shall fund distributions using cash on the balance sheet and cash flow generated from business operations. The Debtor does not anticipate obtaining new financing arrangements (other than the Amended First Internet Debt).

### 2. Disposable Income

If the Reorganized Debtor fails to make any payment of the Disposable Income Payment Amount and that failure remains uncured more than ten (10) Business Days after written notice from a holder of an Allowed Claim, then such holder of the Allowed Claim may file a notice of the default with the Court. The Reorganized Debtor shall have thirty (30) days from the filing of a notice of default to file a response informing the Bankruptcy Court as to how the Reorganized Debtor intends to cure the default. If the Reorganized Debtor fails to file such a response, or fails to comply with further orders of the Bankruptcy Court to cure the default, then the Chapter 11 Case may be converted to a chapter 7 case or dismissed, as may be in the best interests of creditors.

## B. AMENDMENT OF FIRST INTERNET LOAN

### 1. Allowed First Internet Secured Claim

The First Internet Loan shall be deemed modified on the Effective Date, as follows (the "*Amended First Internet Loan*"): (a) The principal amount as of the Effective Date shall be equal

to $74,700[1] *(the "**First Internet Secured Amount**"*); (b) the interest rate shall be 2.75% above the Prime Rate on the Effective Date, compounding quarterly; (c) interest shall accrue until the end of the first quarter in which the Reorganized Debtor realizes a positive Disposable Income Payment Amount, at which time payments of accrued interest and principal shall commence and be due on the last day of each month following such quarter; (d) the amortization schedule shall be modified, such that each quarterly payment is of an equal amount and the final quarterly payment is on the last payment date that occurs on or before June 30, 2036; (e) the Amended First Internet Loan shall be secured by the same security interests in the Debtor's property as secured the First Internet Loan as of the Petition Date; and (f) all other covenants set forth in the First Internet Loan Documents shall survive; *provided* that no breach or default of the First Internet Loan Documents that occurred on or before the Effective Date shall be considered a breach or default of the Amended First Internet Loan.  An amortization schedule is set forth at **Exhibit B**.

### 2.   Documentation

The Reorganized Debtor and First Internet are authorized, but not directed, to enter into new loan documentation consistent with the foregoing, but no such documentation shall be required for the foregoing treatment to be effective. The Reorganized Debtor may amend, refinance or prepay the Amended First Internet Loan at any time during the Income Distribution Period.  For the avoidance of doubt, First Internet's receipt of the Amended First Internet Loan constitutes the distribution to First Internet under the Plan, and subsequent required payments under the Amended First Internet Loan shall not be consider payments under the Plan.

## C.   MODIFICATION OF THE LEASE

Consummation of the Plan is contingent on the Debtor's assumption of the Lease, as amended by the Second Lease Amendment executed by the Debtor and Landlord.  The Debtor has filed a motion (the "***Lease Assumption Motion***") to approve its assumption of the Lease, as amended by the Second Lease Amendment.  If the Bankruptcy Court grants the Lease Assumption Motion, the Lease, as amended by the Second Lease Amendment, will be assumed by the Debtor and become effective immediately.  Pursuant to the Lease Assumption Motion, the term of the Lease will be extended from July 31, 2031 to March 31, 2034, (b) the minimum monthly rent will be reduced to the amounts set forth in Schedule A of the Second Lease Amendment, but paid bi-weekly as opposed to monthly, and (c) the Reorganized Debtor will pay Landlord on a bi-weekly basis the cure payments set forth in Schedule A of the Second Lease Amendment (the "***Lease Cure Payments***") to satisfy in full Landlord's Claim for (i) all rent due prior to the Petition Date, (ii) all rent due from the Petition Date to the date of assumption of the Lease, as amended by the Second Lease Amendment, and (iii) the amount of the security deposit that was drawn down by Landlord prepetition, and that must be restored by Debtor pursuant to the terms of the Second Lease Amendment.

In the event of a monetary default under the Lease, as amended, which default is not cured within ten (10) Business Days, (i) all unpaid prepetition or post-petition rent obligations shall be

---

[1] This amount represents the fair market value of the Estate's assets which secure the First Internet Loan, as agreed upon by the Debtor and First Internet.

17

granted administrative expense priority status in the Chapter 11 Case; and (ii) Landlord shall be entitled to relief from the automatic stay upon ten (10) days' written notice to the Debtor. Debtor shall execute a consent judgment for possession to be held in escrow by Landlord's counsel, which consent judgment may be filed immediately by Landlord upon the granting of relief from the automatic stay by the Bankruptcy Court following a monetary default under the Lease, as amended, that Debtor fails to cure within ten (10) Business Days.

## D.    OTHER EFFECTS OF THE PLAN

### 1.    Organizational Existence

The Debtor shall continue to exist after the Effective Date as a District of Columbia limited liability company, with all the powers of such an entity. The Debtor's operating agreement shall remain in effect in the same form as on the Petition Date, except that it shall be deemed amended to prohibit the issuance of nonvoting equity securities, to the extent required by section 1123(a)(6) of the Bankruptcy Code. Each director and officer of the Debtor shall retain his position following the Effective Date.

### 2.    Vesting of Assets in the Reorganized Debtor

On the Effective Date, all property in the Debtor's estate (including all governmental licenses and privileges held by the Debtor) shall vest in the Reorganized Debtor, free and clear of all claims and interests of creditors and equity security holders of the Debtor. On and after the Effective Date, the Reorganized Debtor may operate its businesses and may use, acquire, or dispose of property without notice and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Notice of the Plan or of the Confirmation Order shall be deemed to be adequate notice that property of the Debtor's estate will vest in the Reorganized Debtor free and claim of all claims and interests. Any person having a claim or interest in property of the Debtor's estate shall be conclusively deemed to have consented to the vesting of such property free and clear of all claims and interests by failing to object to confirmation of the Plan.

### 3.    Authorization to Implement the Plan

The Reorganized Debtor shall be authorized, to the extent consistent with the Plan, to enter into such transactions and take such other actions as may be necessary or appropriate to effectuate the Plan. All actions contemplated under the Plan shall be deemed authorized and approved in all respects, including the making of payments under the Plan, the settlement of Claims by the Reorganized Debtor, and the execution of new documentation with respect to the Amended First Internet Loan. The Reorganized Debtor and its officers and directors shall each be authorized and (as applicable) directed to issue, execute, deliver, file, or record the contracts, securities, instruments, releases, and other agreements and documents contemplated under the Plan (or necessary or desirable to effectuate, implement, or further evidence the transactions contemplated under the Plan) in the name, and on behalf, of the Reorganized Debtor, including any and all agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals set forth in this article shall be effective notwithstanding any approvals,

authorization or requirements under applicable non-bankruptcy law, except for those expressly required pursuant to the Plan.

**4.      Cancellation of Financing Documents**

Upon the entry of a discharge, each financing document (including every loan agreement, receivables sale or purchase agreement, collateral agreement, pledge agreement, mortgage, and financing statement, however denominated), other than any documentation of the Amended First Internet Loan, shall be deemed cancelled, released, surrendered, extinguished and discharged, and shall have no force or effect. Neither the Reorganized Debtor nor any other party shall have any continuing obligation or duty in relation to any such document, and each such document shall be deemed satisfied in full, released, and discharged.

Upon the full payment or other satisfaction of the First Internet Secured Claim, the holder of such Claim shall deliver to the Reorganized Debtor any collateral or other property of the Debtor, and shall file any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory liens, lis pendens, or similar interests or documents and take all other steps reasonably requested by the Reorganized Debtor that may be necessary or desirable to cancel or extinguish (or to document the cancellation or extinguishment of) any such interests or documents.

**5.      Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article XI.C, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (and all Privilege Rights with respect thereto), whether arising before or after the Petition Date, in any court or other tribunal. The Reorganized Debtor may pursue the Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor in their discretion.

No person or entity may rely on the absence of a specific reference in the Plan to any Cause of Action against them as any indication that the Reorganized Debtor will not pursue any and all available Causes of Action against them. Unless a Cause of Action that any Debtor may have or be entitled to assert on behalf of its estate or itself is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Reorganized Debtor expressly reserves that Cause of Action, for later adjudication. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel or laches, shall apply to any Causes of Action as a result of the Chapter 11 Case or the confirmation and consummation of the Plan.

## ARTICLE VIII.
## TREATMENT OF EXECUTORY CONTRACTS
## AND/OR UNEXPIRED LEASES

### A.    ASSUMPTION BY DEFAULT

Except as otherwise provided in this Plan, each Executory Contract shall be deemed assumed as of the Effective Date and the Debtor's rights under each Executory Contract shall vest in the Reorganized Debtor, unless an Executory Contract (a) was previously assumed or rejected; (b) previously expired or was terminated pursuant to its own terms; or (c) is listed in Exhibit C as an Executory Contract being rejected pursuant to this Plan; or (d) is the subject of a motion to reject, assume, or assume and assign filed on or before the Effective Date. Any provision in an Executory Contract (including a "change of control" provision) that restricts, purports to restrict, or is breached or deemed breached by, the Executory Contract's assumption, shall be deemed modified or stricken such that the Reorganized Debtor's counterparty shall not be entitled to terminate its Executory Contract or to exercise any other rights on account of any default.

### B.    ASSUMED CONTRACTS

With the exception of the Lease Cure Payments to be made to the Landlord, the Cure Claim for each assumed Executory Contract shall be Allowed in the amount of $0.00 unless (a) the Plan expressly provides otherwise, (b) a Final Order is entered Allowing the Cure Claim in a different amount, or (c) the Reorganized Debtor otherwise agrees to Allow a Cure Claim in a different amount. Each request for Allowance of a Cure Claim, including one styled as an objection to confirmation of the Plan, shall be heard and determined in accordance with the procedures set forth in Article V.A for Administrative Expenses. If an application for Allowance of a Cure Claim is resolved or determined unfavorably to the Reorganized Debtor, then the Reorganized Debtor may either affirm the assumption or reject the applicable Executory Contract, in which case the counterparty may file a proof of claim within thirty (30) days after being served notice of the rejection.

Allowance and payment of a Cure Claim in accordance with the Plan (including in the amount of $0.00, if applicable) shall constitute full and final satisfaction of all Claims arising from any defaults under an assumed Executory Contract, whether monetary or not, that arose under any Executory Contract at any time before the date that the Executory Contract was assumed.

Consummation of the Plan on the Effective Date shall be deemed to provide adequate assurance of future performance as of the Effective Date as to all Executory Contracts that are assumed.

Any Assumption Dispute, including one styled as an objection to Confirmation, may be scheduled to be heard by the Bankruptcy Court at or after the Confirmation Hearing and may be adjourned from time to time by the Debtor upon notice to the Bankruptcy Court.

## C.    REJECTED CONTRACTS

Pursuant to this Plan, the Debtor is rejecting each of the Executory Contracts listed in Exhibit C hereto.  Any motion to reject an Executory Contract not listed in Exhibit C hereto shall be filed by the Debtor on or before the Effective Date.  In the event the rejection of an Executory Contract is approved by the Bankruptcy Court, either by confirmation of this Plan or by granting of a motion to reject such Executory Contract, a counterparty to a rejected Executory Contract may file a proof of claim for damages resulting for the rejection of the Executory Contract within thirty (30) days following entry of the order (including the Confirmation Order, if applicable) approving the rejection of the Executory Contract.  Any such Claim shall be classified as a Class 3 General Unsecured Claim.

## D.    PARTICULAR CONTRACTS

### 1.    Insurance Policies

To the extent that any Insurance Policy is an Executory Contract, such an Insurance Policy shall be assumed as of the Effective Date.

The automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted, solely with respect to insurance providers, claimants with valid workers' compensation claims, and named beneficiaries of any Insurance Policy, solely to permit: (a) workers' compensation claimants and named beneficiaries to proceed with their claims; and (b) insurance providers to administer, defend, settle, and pay, such claims in the ordinary course of business and without further order of the Bankruptcy Court.

### 2.    Compensation and Benefit Plans

Unless otherwise provided in this Plan, all formal and informal employment, confidentiality, and non-competition agreements, vacation policies, 401(k) or other retirement plans, medical or other insurance plans (including dental, vision, life and disability), flexible spending account plans, and other health and welfare benefit plans, programs, agreements and arrangements, and all other wage, compensation, expense reimbursement, and other benefit obligations shall be assumed, to the extent that each one is an Executory Contract, and shall be performed by the Reorganized Debtor.

### 3.    Post-petition Contracts

All contracts and leases entered into after the Petition Date by the Debtor shall be performed by the Reorganized Debtor in the ordinary course of its business. The Debtor's rights under all such contracts and leases shall vest in and be fully enforceable by and against the Reorganized Debtor in accordance with each contract's and lease's terms.

21

## ARTICLE IX.
## CLAIM RESOLUTION

### A.   RESOLUTION OF CLAIMS, GENERALLY

Without regard to any requirements that may be imposed pursuant to Bankruptcy Rule 9019, (a) the Reorganized Debtor shall have the authority to prosecute and sole authority to settle (without notice to or approval of the Bankruptcy Court) any dispute regarding a Claim.

The Reorganized Debtor shall file any objection (including an omnibus objection) to a Claim or any motion to estimate a Claim, (a) as to a Claim that is scheduled or filed prior to the General Bar Date, no later than the Claim Objection Deadline, and (b) as to any other Claim, no later than sixty (60) days after the scheduling or filing of the Claim.

Any Claim that is listed in the Schedules as contingent, unliquidated or disputed, and for which no proof of claim has been filed, shall be Disallowed without need for objection or further order of the Bankruptcy Court.

Any motion seeking reconsideration of an order Allowing or Disallowing a Claim must be filed within twenty-one (21) days after entry of the order.

## ARTICLE X.
## DISTRIBUTIONS

### A.   MANNER OF DISTRIBUTIONS

#### 1.   Discharge of Subchapter V Trustee

Notwithstanding the provisions of section 1194(b) of the Bankruptcy Code, whether the Plan is confirmed consensually or non-consensually, all distributions under the Plan shall be made by the Reorganized Debtor pursuant to the terms of the Plan, and the Subchapter V Trustee shall be entitled to a full discharge of her obligations as of the Effective Date.

#### 2.   Means of Payment

At the option of the Reorganized Debtor, any cash payment under the Plan may be made by check, wire transfer, automated clearing house, credit card, or other commercially reasonable means. Notwithstanding the foregoing, if the Bankruptcy Court grants the Lease Assumption Motion, payments to the Landlord pursuant to the Lease, as amended, shall be made by the Debtor via ACH transfers.

#### 3.   Undeliverable Payments

If a distribution to a holder of a Claim is undeliverable for any reason (including an undeliverable address or the recipient's failure to provide necessary information), then no distribution to such holder shall be made unless and until the holder has cured the reason that its distribution was undeliverable, after which its distribution shall be made on the next interim distribution date without interest. Any undeliverable distribution shall be deemed unclaimed property under section

22

347(b) of the Bankruptcy Code at the expiration of 180 days after such distribution was first attempted to be made, as determined in good faith by the Reorganized Debtor. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, state or other jurisdiction escheat, abandonment, or unclaimed property laws to the contrary.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 180 days from and after the date of issuance. Requests for reissuance of any check must be made directly and in writing to the Reorganized Debtor by the holder of the relevant Allowed Claim within the 180-day period. After that date, the relevant Allowed Claim (and any claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtor, notwithstanding any applicable federal, state, other U.S. or non-U.S. jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary.

### 4.    Disputed Claims

No distributions will be made under the Plan on account of a disputed Claim until such Claim becomes an Allowed Claim pursuant to a Final Order or settlement. To the extent that a disputed Claim ultimately becomes an Allowed Claim, any distributions under the Plan shall be made to the holder of such Claim, in such a manner as to ensure similar treatment to holders of similar Allowed Claims, but without any interest on account of such Claim.

### 5.    Liability

The Reorganized Debtor shall not incur any liability whatsoever on account of any distributions under the Plan, except in the event of actual fraud, gross negligence, or willful misconduct, as determined by a Final Order of a court of competent jurisdiction.

## B.    CALCULATION

### 1.    Setoff and Recoupment

The Reorganized Debtor may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Reorganized Debtor may have against the holder of such Claim that have not been otherwise released, compromised or settled on or prior to the Effective Date (pursuant to the Plan or otherwise); *provided* that neither the failure to do so nor the Allowance of any Claim under this Plan shall constitute a waiver or release by the Reorganized Debtor of any claim the Reorganized Debtor may have against the holder of such Claim or Interest.

### 2.    No Post-petition Interest

Post-petition interest shall not accrue, be Allowed, or be paid on any Claim unless otherwise provided for in the Plan as required by the Bankruptcy Code.

### 3. Single Satisfaction

Notwithstanding anything else contained in the Plan or Confirmation Order, in no case shall a distribution be made under the Plan on account of an Allowed Claim to the extent that the aggregate value of all property received or retained on account of such Allowed Claim (from whatever source) would exceed One Hundred percent (100%) of the underlying Allowed Claim.

## C. COMPLIANCE WITH TAX REQUIREMENTS

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtor may make distributions under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances. Notwithstanding the foregoing, each holder of an Allowed Claim that receives a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on account of its distribution by any governmental unit, including income, withholding, and other tax obligations. The Reorganized Debtor has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations. The Reorganized Debtor may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9 or similar form, as applicable to each such holder.

## ARTICLE XI.
## RELEASES, EXCULPATIONS, AND INJUNCTIONS

## A. DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS

*The discharge provisions set forth in this Article XI.A are binding on all Persons and Entities, and are enforceable through the injunction provisions set forth below at Article XI.D.*

Except as otherwise provided in the Plan, effective as of the Effective Date (or, if the Plan is confirmed pursuant to section 1191(b) of the Bankruptcy Code, then upon the granting of a discharge under section 1192 of the Bankruptcy Code): (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Petition Date, against the Debtor or any of its assets, property, or estate; (b) the Plan shall bind each holder of a Claim against or Interest in the Debtor, regardless of whether any such holder voted to accept or reject the Plan or did not vote at all; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified

24

under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Reorganized Debtor, its successors and assigns and its assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

**B.    RELEASE OF LIENS**

> *The lien release provisions set forth in this Article XI.B are binding on all Persons and Entities, and are enforceable through the injunction provisions set forth below at Article XI.D.*

Except as otherwise expressly provided in the Plan as to the Amended First Internet Loan, on the Effective Date, and without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtor:

1.    All mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns;

2.    The Reorganized Debtor (and any of its agents, attorneys, or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases, or such other forms or release documents in any jurisdiction as may be necessary or appropriate to evidence such releases and implement the provisions of this Article XI.B; and

3.    The presentation or filing of the Confirmation Order to or with any federal, state, local or non-U.S. agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, liens, pledges, or other security interests.

**C.    EXCULPATION**

> *The exculpation provisions set forth in this Article XI.C are binding on all persons and entities, and are enforceable through the injunction provisions set forth below at Article XI D.*

Notwithstanding anything in the Plan to the contrary, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action arising during the period from the Petition Date to the Effective Date (and following the Effective Date solely with respect to any distribution of property, or the implementation of the Restructuring, each pursuant to and in accordance with the Plan) in connection with or arising out of the administration of the Chapter 11 Case; the formulation, negotiation, solicitation of votes for, confirmation or implementation of the Plan; any settlement or other acts approved by the Bankruptcy Court; the administration and

implementation of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing (collectively, the "***Covered Exculpation Matters***").

Each Exculpated Party shall be entitled in all respects to rely reasonably (and to have relied reasonably) on the advice of counsel with respect to the Exculpated Party's duties and responsibilities. The Exculpated Parties have, and upon implementation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.

The exculpations set forth in this Article XI.C do not apply to any Causes of Action arising out of or relating to any act or omission of an Exculpated Party that is determined by a Final Order of a court of competent jurisdiction to have constituted gross negligence, willful misconduct, or actual fraud on the part of the Exculpated Party.

## D.    INJUNCTIONS

> *The injunctions set forth in this Article XI.D are binding on all persons and entities, and enjoin certain conduct not otherwise enjoined under the Bankruptcy Code.*

**Upon entry of the Confirmation Order, all persons and entities shall be ENJOINED from taking any actions to interfere with the implementation or consummation of the Plan, or the vesting of the Debtor's assets in, and the enjoyment of such assets by, the Reorganized Debtor pursuant to this Plan.**

**Except as otherwise expressly provided in this Plan or in the Confirmation Order, all persons and entities are permanently ENJOINED, from commencing or continuing any action, the employment of process, or any other act, to pursue, collect, recover or offset any Claim, Interest, debt, obligation or Cause of Action that has been extinguished, discharged, released or made subject to exculpation under this Plan (the "*Covered Matters*"), whether against the Debtor, the Reorganized Debtor, or the Exculpated Parties (the "*Covered Entities*"). The acts enjoined by the foregoing injunction include any act to:**

1.  **enforce, attach, collect, or recover by any manner or means any judgment, award, decree, or order against a Covered Entity or any of the property or interests in property of a Covered Entity on account of or in connection with or with respect to any Covered Matter;**

2.  **create, renew, perfect, or enforce any lien or encumbrance of any kind against a Covered Entity or any of the property or interests in property of a Covered**

26

**Entity** on account of or in connection with or with respect to any Covered Matter; or

3. assert any right of setoff, subrogation, or recoupment of any kind against any obligation due from a Covered Entity or from any of the property or interests in property of a Covered Entity on account of or in connection with or with respect to any Covered Matter, unless the person or entity holding such setoff, subrogation or recoupment right has asserted such a right and has expressly stated its intent to preserve its right in a pleading filed with the Bankruptcy Court and served on the Debtor and the applicable Covered Entity no later than the later of (x) 28 days after entry of the Confirmation Order and (y) the Effective Date.

**With respect to any Covered Entity, no person or entity may commence or continue any action, employ any process, or take any other act to pursue, collect, recover or offset any Claim, Interest, debt, obligation, or Cause of Action relating or reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Covered Released Matter, Covered Matter, or Covered Exculpation Matter (including one that alleges the actual fraud, gross negligence, or willful misconduct of a Covered Entity), unless expressly authorized by the Bankruptcy Court after (1) it determines that, after notice and a hearing, such Claim, Interest, debt, obligation, or Cause of Action is colorable and (2) it specifically authorizes such person or entity to bring such Claim or Cause of Action. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether any such Claim, Interest, debt, obligation, or Cause of Action is colorable and, only to the extent legally permissible and shall have jurisdiction to adjudicate such underlying colorable Claim, Interest, debt, obligation, or Cause of Action**.

## E.    SUBORDINATION RIGHTS

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan. All subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated.

## ARTICLE XII.
## CONDITIONS TO EFFECTIVE DATE

These are the conditions to the Effective Date, which must be satisfied or waived by the Debtor in its sole discretion, at or before the Effective Date:

1. The Bankruptcy Court shall have granted the Lease Assumption Motion;

2. The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order in form and substance acceptable to the Debtor;

3. The final version of the Plan shall be in form and substance acceptable to the Debtor; and

4.      There shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other governmental unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of the Plan.

## ARTICLE XIII.
## MODIFICATION, REVOCATION
## OR WITHDRAWAL OF PLAN

### A.      MODIFICATION AND AMENDMENTS

To the extent consistent with the Bankruptcy Code and the Bankruptcy Rules, the Debtor reserves the right to (a) modify the Plan prior to its confirmation, whether such a modification is material or immaterial, and (b) seek confirmation of the Plan as so modified.

To the extent consistent with the Bankruptcy Code and the Bankruptcy Rules, the Debtor reserves the right to modify the Plan one or more times after confirmation of the Plan, or to initiate proceedings in the Bankruptcy Court to so modify the Plan, in such manner as to carry out the purposes and intent of the Plan, to remedy any defect or omission in the Plan, to reconcile inconsistencies in the Plan and the Confirmation Order, or to make appropriate technical adjustments in a manner that does not adversely affect the treatment of holders of Claims.

### B.      REVOCATION OR WITHDRAWAL

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file an alternative plan of reorganization. If the Debtor revokes or withdraws the Plan or the Plan is not confirmed, then (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtor or any other entity; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other entity; or (iv) be used by the Debtor or any other entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

## ARTICLE XIV.
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including exclusive jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, Interest or Administrative Expense;

2.      resolve any dispute concerning the maturity, payment and amortization schedule of the Amended First Internet Loan in accordance with the Plan;

28

3.      adjudicate all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Debtor Professionals pursuant to the Bankruptcy Code or the Plan;

4.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract with respect to which the Debtor may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or Cure Claims; and (b) any dispute regarding whether a contract or lease is or was executory or unexpired;

5.      ensure that distributions are accomplished pursuant to the Plan;

6.      adjudicate any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

7.      adjudicate any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Confirmation Order, the Plan, or the Plan Supplement;

9.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan and ensure compliance with the Plan;

12.     enter a discharge of the Debtor under section 1192 of the Bankruptcy Code;

13.     hear and determine any cases, controversies, suits, disputes, or Causes of Action involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan or under section 1192 of the Bankruptcy code, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

29

15. determine any other matters that may arise in connection with, or relate to, the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan;

16. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency with any Bankruptcy Court order, including the Confirmation Order;

17. recover all assets of the Debtor and property of its estates, wherever located;

18. adjudicate any disputes concerning whether an entity had sufficient notice of the Chapter 11 Case, the Plan, any solicitation conducted in the Chapter 11 Case, any bar date established in the Chapter 11 Case, or any deadline for responding or objecting to the amount of a Cure Claim, or confirmation of the Plan, including, for the purpose of determining whether a Claim is discharged under this Plan;

19. enforce all orders previously entered by the Bankruptcy Court;

20. adjudicate any Cause of Action against the Reorganized Debtor or any director or officer of the Reorganized Debtor arising out of or related to a Covered Exculpation Matter; and

21. adjudicate any other matter as to which the Bankruptcy Court has jurisdiction.

Notwithstanding the foregoing: (a) the Amended First Internet Loan (other than the matters described in clause 2 of this Article) shall be governed in accordance with the applicable jurisdictional, forum selection, and dispute resolution clauses that may be set forth in its governing documents and (c) the Debtor's operating agreement shall be governed in accordance with its applicable jurisdictional, forum selection, and dispute resolution clauses.

### ARTICLE XV.
### MISCELLANEOUS PROVISIONS

## A.   EFFECT OF PLAN

### 1.   Immediate Binding Effect

Immediately following the conclusion of the stays set forth in Bankruptcy Rule 3020(e), 6004(h), and 7062, the terms of the Plan shall be effective and enforceable and binding upon the Debtor, the Reorganized Debtor, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all entities that are party, or subject to, the settlements, compromises, releases, discharges, and injunctions described in the Plan, each entity acquiring property under the Plan, and any and all of the Debtor's counterparties to Executory Contracts and/or Unexpired Leases and any other prepetition agreements.

### 2.   Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

30

3.      **Successors and Assigns**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each entity.

B.      **CONTENTS OF PLAN**

1.      **Rules of Interpretation**

Unless otherwise specified in this Plan: (a) the rules of construction set forth in section 102 of the Bankruptcy Code and (to the extent not inconsistent with section 102) 1 U.S.C. § 1 are intended to apply; (b) any reference to an entity as a holder of a Claim or Interest includes that entity's successors, transferees and assigns; (c) any reference to the Debtor or the Reorganized Debtor also refers, respectively, to the Reorganized Debtor and the Debtor to the extent not inconsistent with context; (d) docket numbers refer to filings in the Chapter 11 Case; (e) any reference to a document means that document, schedule or exhibit, as it may be amended, modified, or supplemented from time to time; (f) any reference to an event occurring on a specified date (including the Effective Date) means that the event will occur on that date or as soon thereafter as reasonably practicable; (g) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (h) all references to statutes, regulations, orders, rules of courts and the like mean as amended from time to time and as applicable to the Chapter 11 Case; (i) all references to monetary figures, "cash," "dollars," or "$" refer to the currency of the United States of America; (j) the provisions of Bankruptcy Rule 9006(a) apply in computing any period of time prescribed or allowed by the Plan; (k) if the date on which an action or transaction may or shall occur pursuant to the Plan is not a Business Day, then that action or transaction may or shall instead occur on the next Business Day; (*l*) unless federal law (including the Bankruptcy Code and Bankruptcy Rules) applies, the laws of the District of Columbia, without giving effect to the principles of conflict of laws that would require application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan, except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control.

2.      **Exhibits**

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with consummation of the Plan) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

3.      **Non-Severability**

Each term and provision of the Plan is integral to the Plan, non-severable and mutually dependent with other terms of the Plan, and may not be deleted or modified without consent of the Debtor.

31

**4.      Conflicts**

In the event of a conflict between the Confirmation Order and the Plan, the Confirmation Order shall control, without prejudice to the right of any party to seek to amend the Confirmation Order to conform to the Plan.

## C.      NOTICES

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor or the Reorganized Debtor shall be served on:

DKC Enterprises, LLC
1335 H Street, N.E.
Washington, D.C.  20002
Attention:      Michael Spinello

with a copy to:

Hirschler Fleischer, P.C.
1676 International Drive
Suite 1350
Tysons, VA  22102
Attention:      Lawrence A. Katz
Email:          lkatz@hirschlerlaw.com

Any pleading, notice or other document required by the Plan to be served on or deliver to the Subchapter V Trustee shall be served on:

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Attention:      Monique D. Almy

32

After entry of the Confirmation Order, the Debtor shall notify all Persons entitled to notice of filings in the Chapter 11 Case that each such Person (other than the U.S. Trustee and the Subchapter V Trustee) must file a renewed request pursuant to Bankruptcy Rule 2002 in order to continue to receive documents that are filed after the Effective Date. After service of that notice and consummation of the Plan, the Reorganized Debtor shall be authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the Reorganized Debtor, the U.S. Trustee, the Subchapter V Trustee, and those Persons that have filed renewed requests.

Dated: April 15, 2026                    DKC ENTERPRISES, LLC

                                         By: */s/ Michael Spinello*
                                             Managing Member

                                         Through Counsel:

                                         */s/ Lawrence A. Katz*
                                         Lawrence A. Katz (D.C. Bar No. 252825)
                                         HIRSCHLER FLEISCHER, PC
                                         1676 International Drive
                                         Suite 1350
                                         Tysons, VA  22102
                                         Telephone: (703) 584-8362
                                         Email:  LKatz@hirschlerlaw.com

                                         *Counsel to DKC Enterprises, LLC*

33

## CERTIFICATE OF SERVICE

I hereby certify that, on April 15, 2026, I caused the foregoing First Amended Plan of Reorganization of DKC Enterprises, LLC to be filed and served through the Court's CM/ECF system upon all counsel and parties who have appeared in the above-captioned case, including the U.S. Trustee for Region Four, and Monique Almy as Subchapter V Trustee.

Dated: April 15, 2026

/s/ Lawrence A. Katz
Lawrence A. Katz

24422475.5 050846.00001

# EXHIBIT A TO
# PLAN OF REORGANIZATION
# OF DKC ENTERPRISES, LLC

## FINANCIAL PROJECTIONS

**Financial Projections**

### 2027

| | | |
|---|---|---:|
| Gross Core Revenue | $ | 2,276,772 |
| TIPS | $ | 398,435 |
| Sales Tax | $ | 159,374 |
| Discounts (non cash) | $ | 125,222 |
| Total Net Core Revenue | $ | 1,593,741 |
| Gross Event Sales | $ | 221,960 |
| TIPS | $ | 19,976 |
| Event Sales Tax | $ | 17,757 |
| Net Event Sales | $ | 184,227 |
| Other Sales | $ | 6,000 |
| Total Gross Sales | $ | 1,783,967 |
| MTM % Increase | | |
| *Expenses* | | |
| COGS | $ | 321,114 |
| Payroll Incl GP (Excl. Tips) | $ | 842,142 |
| Rent | $ | 366,474 |
| Accounting Fees | $ | 15,840 |
| Marketing | $ | 18,000 |
| Events | $ | 29,000 |
| Insurance (GL, WC) | $ | 35,868 |
| Utilities | $ | 48,000 |
| Bank/Credit Card Fees | $ | 80,279 |
| Overhead | $ | 77,900 |
| Total Costs | $ | 1,834,616 |
| Operating Profit | $ | (50,649) |
| Year End Cash (Excluding Optg Reserve) | $ | 20,171 |
| Annual Restructuring Payments | $ | 31,088 |

### 2028

| | | |
|---|---|---:|
| Gross Core Revenue | $ | 2,322,308 |
| TIPS | $ | 406,404 |
| Sales Tax | $ | 162,562 |
| Discounts (non cash) | $ | 127,727 |
| Total Net Core Revenue | $ | 1,625,615 |
| Gross Event Sales | $ | 244,156 |
| TIPS | $ | 21,974 |
| Event Sales Tax | $ | 19,532 |
| Net Event Sales | $ | 202,649 |
| Other Sales | $ | 6,000 |
| Total Gross Sales | $ | 1,834,265 |
| MTM % Increase | | |
| *Expenses* | | |
| COGS | $ | 330,168 |
| Payroll Incl GP (Excl. Tips) | $ | 845,785 |
| Rent | $ | 373,098 |
| Accounting Fees | $ | 15,840 |
| Marketing | $ | 18,000 |
| Events | $ | 29,000 |
| Insurance (GL, WC) | $ | 35,868 |
| Utilities | $ | 48,000 |
| Bank/Credit Card Fees | $ | 82,542 |
| Overhead | $ | 75,500 |
| Total Costs | $ | 1,853,800 |
| Operating Profit | $ | (19,536) |
| Year End Cash (Excluding Optg Reserve) | $ | 17,734 |
| Annual Restructuring Payments | $ | 31,088 |

### 2029

| | | |
|---|---|---:|
| Gross Core Revenue | $ | 2,368,754 |
| TIPS | $ | 414,532 |
| Sales Tax | $ | 165,813 |
| Discounts (non cash) | $ | 130,281 |
| Total Net Core Revenue | $ | 1,658,128 |
| Gross Event Sales | $ | 268,571 |
| TIPS | $ | 24,171 |
| Event Sales Tax | $ | 21,486 |
| Net Event Sales | $ | 222,914 |
| Other Sales | $ | 6,000 |
| Total Gross Sales | $ | 1,887,042 |
| MTM % Increase | | |
| *Expenses* | | |
| COGS | $ | 339,668 |
| Payroll Incl GP (Excl. Tips) | $ | 849,500 |
| Rent | $ | 333,686 |
| Accounting Fees | $ | 15,840 |
| Marketing | $ | 18,000 |
| Events | $ | 29,000 |
| Insurance (GL, WC) | $ | 35,868 |
| Utilities | $ | 48,000 |
| Bank/Credit Card Fees | $ | 84,917 |
| Overhead | $ | 75,500 |
| Total Costs | $ | 1,829,979 |
| Operating Profit | $ | 57,063 |
| Year End Cash (Excluding Optg Reserve) | $ | 95,311 |
| Annual Restructuring Payments | $ | 12,747 |

34

# EXHIBIT B TO
# PLAN OF REORGANIZATION
# OF DKC ENTERPRISES, LLC

## AMORTIZATION AND PAYMENT SCHEDULE
## FOR AMENDED FIRST INTERNET LOAN

### NEW SBA LOAN AMORTIZATION SCHEDULE
*Quarterly Payment — Compounding Quarterly*

**SUMMARY OF TERMS**

| | | |
|---|---|---|
| Loan Amount | $71,700 | Principal balance at origination |
| Annual Interest Rate | 9.50% | Stated annual rate |
| Compounding | Quarterly | Interest compounds 4× per year |
| Quarterly Rate (i) | 2.38% | 0.02375 |
| Loan Date | 6/1/2026 | First day of loan |
| First Payment Date | 9/1/2026 | End of first quarter |
| Payment Frequency | Quarterly | 4 payments per year |
| Number of Payments (n) | 40 | Total payments over life of loan |
| Loan Term (Years) | 10 | 10 |
| Quarterly Payment (PMT) | $2,796.46 | ← Calculated via Excel PMT function |
| Total of All Payments | $111,858.31 | |
| Total Interest Paid | $40,158.31 | |

**PAYMENT SCHEDULE**

| Pmt # | Payment Date | Beginning Balance | Payment | Principal | Interest | Ending Balance | Cumul. Interest |
|---|---|---|---|---|---|---|---|
| 1 | 9/1/2026 | $71,700.00 | $2,796.46 | $1,093.58 | $1,702.88 | $70,606.42 | $1,702.88 |
| 2 | 12/1/2026 | $70,606.42 | $2,796.46 | $1,119.56 | $1,676.90 | $69,486.86 | $3,379.78 |
| 3 | 3/1/2027 | $69,486.86 | $2,796.46 | $1,146.14 | $1,650.31 | $68,340.72 | $5,030.09 |
| 4 | 6/1/2027 | $68,340.72 | $2,796.46 | $1,173.37 | $1,623.09 | $67,167.35 | $6,653.18 |
| 5 | 9/1/2027 | $67,167.35 | $2,796.46 | $1,201.23 | $1,595.22 | $65,966.12 | $8,248.41 |
| 6 | 12/1/2027 | $65,966.12 | $2,796.46 | $1,229.76 | $1,566.70 | $64,736.36 | $9,815.10 |
| 7 | 3/1/2028 | $64,736.36 | $2,796.46 | $1,258.97 | $1,537.49 | $63,477.39 | $11,352.59 |
| 8 | 6/1/2028 | $63,477.39 | $2,796.46 | $1,288.87 | $1,507.59 | $62,188.52 | $12,860.18 |
| 9 | 9/1/2028 | $62,188.52 | $2,796.46 | $1,319.48 | $1,476.98 | $60,869.04 | $14,337.16 |
| 10 | 12/1/2028 | $60,869.04 | $2,796.46 | $1,350.82 | $1,445.64 | $59,518.22 | $15,782.80 |
| 11 | 3/1/2029 | $59,518.22 | $2,796.46 | $1,382.90 | $1,413.56 | $58,135.32 | $17,196.35 |
| 12 | 6/1/2029 | $58,135.32 | $2,796.46 | $1,415.74 | $1,380.71 | $56,719.57 | $18,577.07 |
| 13 | 9/1/2029 | $56,719.57 | $2,796.46 | $1,449.37 | $1,347.09 | $55,270.20 | $19,924.16 |
| 14 | 12/1/2029 | $55,270.20 | $2,796.46 | $1,483.79 | $1,312.67 | $53,786.41 | $21,236.82 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 15 | 3/1/2030 | $53,786.41 | $2,796.46 | $1,519.03 | $1,277.43 | $52,267.38 | $22,514.25 |
| 16 | 6/1/2030 | $52,267.38 | $2,796.46 | $1,555.11 | $1,241.35 | $50,712.28 | $23,755.60 |
| 17 | 9/1/2030 | $50,712.28 | $2,796.46 | $1,592.04 | $1,204.42 | $49,120.24 | $24,960.02 |
| 18 | 12/1/2030 | $49,120.24 | $2,796.46 | $1,629.85 | $1,166.61 | $47,490.38 | $26,126.62 |
| 19 | 3/1/2031 | $47,490.38 | $2,796.46 | $1,668.56 | $1,127.90 | $45,821.82 | $27,254.52 |
| 20 | 6/1/2031 | $45,821.82 | $2,796.46 | $1,708.19 | $1,088.27 | $44,113.63 | $28,342.79 |
| 21 | 9/1/2031 | $44,113.63 | $2,796.46 | $1,748.76 | $1,047.70 | $42,364.87 | $29,390.49 |
| 22 | 12/1/2031 | $42,364.87 | $2,796.46 | $1,790.29 | $1,006.17 | $40,574.58 | $30,396.65 |
| 23 | 3/1/2032 | $40,574.58 | $2,796.46 | $1,832.81 | $963.65 | $38,741.77 | $31,360.30 |
| 24 | 6/1/2032 | $38,741.77 | $2,796.46 | $1,876.34 | $920.12 | $36,865.43 | $32,280.42 |
| 25 | 9/1/2032 | $36,865.43 | $2,796.46 | $1,920.90 | $875.55 | $34,944.52 | $33,155.97 |
| 26 | 12/1/2032 | $34,944.52 | $2,796.46 | $1,966.53 | $829.93 | $32,978.00 | $33,985.90 |
| 27 | 3/1/2033 | $32,978.00 | $2,796.46 | $2,013.23 | $783.23 | $30,964.77 | $34,769.13 |
| 28 | 6/1/2033 | $30,964.77 | $2,796.46 | $2,061.04 | $735.41 | $28,903.72 | $35,504.54 |
| 29 | 9/1/2033 | $28,903.72 | $2,796.46 | $2,109.99 | $686.46 | $26,793.73 | $36,191.01 |
| 30 | 12/1/2033 | $26,793.73 | $2,796.46 | $2,160.11 | $636.35 | $24,633.62 | $36,827.36 |
| 31 | 3/1/2034 | $24,633.62 | $2,796.46 | $2,211.41 | $585.05 | $22,422.21 | $37,412.41 |
| 32 | 6/1/2034 | $22,422.21 | $2,796.46 | $2,263.93 | $532.53 | $20,158.28 | $37,944.93 |
| 33 | 9/1/2034 | $20,158.28 | $2,796.46 | $2,317.70 | $478.76 | $17,840.59 | $38,423.69 |
| 34 | 12/1/2034 | $17,840.59 | $2,796.46 | $2,372.74 | $423.71 | $15,467.84 | $38,847.41 |
| 35 | 3/1/2035 | $15,467.84 | $2,796.46 | $2,429.10 | $367.36 | $13,038.74 | $39,214.77 |
| 36 | 6/1/2035 | $13,038.74 | $2,796.46 | $2,486.79 | $309.67 | $10,551.96 | $39,524.44 |
| 37 | 9/1/2035 | $10,551.96 | $2,796.46 | $2,545.85 | $250.61 | $8,006.11 | $39,775.05 |
| 38 | 12/1/2035 | $8,006.11 | $2,796.46 | $2,606.31 | $190.15 | $5,399.80 | $39,965.19 |
| 39 | 3/1/2036 | $5,399.80 | $2,796.46 | $2,668.21 | $128.25 | $2,731.58 | $40,093.44 |
| 40 | 6/1/2036 | $2,731.58 | $2,796.46 | $2,731.58 | $64.88 | $0.00 | $40,158.31 |
| **TOTALS** | | | $111,858.31 | $71,700.00 | $40,158.31 | | |

**EXHIBIT C TO**
**PLAN OF REORGANIZATION**
**OF DKC ENTERPRISES, LLC**

**REJECTED EXECUTORY CONTRACTS**

| Vendor | Service | Account Number | Vendor Address |
|---|---|---|---|
| Republic Services | Waste Removal | 3-0411-0015551 | 300 Ritchie Rd<br>Capitol Heights MD 20743-361414 |
| Bluedrop | Bartop water filtration and carbonation machines | Henceforth | 24 Norfolk Ave, STE A<br>South Easton, MA 02375 |
| AutoChlor | Glasswasher lease | 53100 | 6301 Stevenson Avenue Suite 1<br>Alexandria, VA 22304 |
| BarTrack | Draft beer inventory management system | Henceforth | 45662 Terminal Drive<br>Suite 120<br>Sterling , VA 20166 |

37